**THE CANADA LIFE ASSURANCE COMPANY, Plaintiff–Appellant,**

v.

**CONVERIUM RÜCKVERSICHERUNG (DEUTSCHLAND) AG, f/k/a ZURICH RÜCKVERSICHERUNG (KÖLN) AG, Defendant–Appellee.**

**Docket No. 02–7590.**

United States Court of Appeals, Second Circuit.

Submitted: Aug. 28, 2002.

Decided: July 8, 2003.

Block, LLC, Chicago, Illinois; Vincent J. Vitkowsky (Peter T. Maloney, of counsel), Edwards & Angell, LLP, New York, New York, for Plaintiff–Appellant.

Richard Mancino (Christopher J. St. Jeanos, Berna M. Lee, Jordan M. Alpert, of counsel), Willkie Farr & Gallagher, New York, New York, for Defendant–Appellee.

Before: WINTER, SOTOMAYOR, Circuit Judges, and KOELTL, District Judge.*

WINTER, Circuit Judge.

This action arises out of a contract dispute between foreign reinsurers. The Canada Life Assurance Company (hereafter "CLA"), a Canadian reinsurer, claims that Converium Rückversicherung (hereafter "CR"), a German reinsurer, has refused to pay its share of losses, many of which resulted from the terrorist acts of September 11, 2001, under reinsurance contracts with CLA. The sole basis for federal jurisdiction asserted by CLA is Section 408(b)(3) of the Air Transportation Safety and System Stabilization Act of 2001 ("Air Stabilization Act"), Pub.L. No. 107–42, 115 Stat. 230 (Sept. 22, 2001) (amended by the Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat. 597 (Nov. 19, 2001)) ("Aviation Security Act"), legislation enacted in the aftermath of the September 11 attacks. Judge Pauley dismissed the complaint for lack of subject matter jurisdiction. We affirm.

## BACKGROUND

CLA's complaint alleges that CR failed to meet its obligations with regard to sharing losses as agreed upon in retrocession agreements. Many of the losses in question were originally suffered by primary

John H. Mathias, Jr. (Barry Sullivan, David M. Kroeger, of counsel), Jenner &

* The Honorable John G. Koeltl, United States District Judge for the Southern District of New York, sitting by designation.

insureds as a result of the events of September 11. Prior to those events, CLA had participated in reinsurance facilities managed by the Insurance Services Associated, Ltd. ("ISA"). The ISA facilities are part of a network of companies that redistributes insurance risks. CLA used the ISA to spread its exposure on its portfolio of reinsurance contracts by ceding portions of the contracts' premiums and risks of loss to various retrocessionaires, including CR. The retrocessionaires in turn agreed to indemnify appellant according to quota share reinsurance agreements.

In particular, the complaint alleges:

As a result of the murderous attacks of September 11, an enormous number of claims have been made upon insurance policies issued by many different insurers ("primary insurers"). In the first instance, these primary insurers have been called upon to respond with payments to claimants either immediately upon or very shortly after being presented with an appropriate proof of loss. In turn, these primary insurers have made claims against reinsurance companies ("reinsurers") [such as CLA] under reinsurance agreements which provide indemnity coverage for loss payments made by the primary insurers. In further sequence, these reinsurers have made claims under retrocession agreements issued by other reinsurance companies ("retrocessionaires") [such as CR], which provide indemnification for the loss payments made by the reinsurers. In order to ensure that the insurance industry adequately responds to claims arising from the terrorist attacks of September 11, it is essential that all insurers and reinsurers in this chain promptly comply with their commitments. Canada Life has done so; Zürich Rück [CR] has brazenly decided not to do so, elevating its own financial interests above those of all other insurers and reinsurers responding to this global emergency.

*   *   *   *   *   *

The contracts reinsured by Canada Life through the ISA Facility included several types of contracts that were severely impacted by the thousands of lives lost in the terrorist attacks of September 11. These included Catastrophe, Occupational Accident, Personal Accident, Group Life, and Abnormal Mortality Loss reinsurance contracts. Claims by victims of the terrorist attacks of September 11 comprise a substantial portion of the original insurance losses reinsured by Canada Life under these contracts. Those original insurance losses have included workers compensation and life benefits claims by the families of employees of the Fire Department of the City of New York, Marsh & McLennan, Fiduciary Trust, Cantor Fitzgerald, AIG, Boeing, Cisco Systems, Raytheon, Price Waterhouse, TJX, Royal Sun & Alliance, John Hopkins University, and Aramark, to name a few. Through the ISA facility, Canada Life has paid and is paying the primary insurers responsible for paying those losses, including those paid by insurers authorized to do business in New York.

Because there is no federal question jurisdiction in this matter and disputes between corporations organized in foreign countries do not meet the requirements of diversity jurisdiction, *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir.2002), federal subject matter jurisdiction over this action is based, if at all, on Section 408(b)(3) of the Air Stabilization Act passed in the aftermath of September 11. The district court held that Section 408(b)(3) does not provide jurisdiction over

appellant's action and dismissed the complaint. This appeal followed.

## DISCUSSION

■ We review de novo a dismissal of a complaint for lack of subject matter jurisdiction. See Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir.2001); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir.1997).

### a) The Statutory Scheme

In the immediate aftermath of September 11, and in response to concerns that the airline industry was on the brink of a financial collapse, Congress enacted, and the President signed into law, the Air Stabilization Act, later amended by the Aviation Security Act. The Air Stabilization Act contains five principal titles. Titles I, II, III and V provide financial and tax relief to the airline industry, including federal support for airline insurance, and affirm the President's decision to spend $3 billion on airline safety and security.

It is part of Title IV that is at issue in the present case. Title IV's general purpose is to protect the airline industry and other potentially liable entities from financially fatal liabilities while ensuring that those injured or killed in the terrorist attacks receive adequate compensation. See, e.g., 147 Cong. Rec. S9594 (Sept. 21, 2001) (statement of Sen. McCain) (expressing concern that if the two airlines were found negligent, they "would be dissolved as their assets were sold to pay off their liability," and that "some or all of the victims who were injured or killed in this tragedy would receive no compensation"). Title IV establishes the September 11th Victim Compensation Fund, which provides to those killed or injured in the attacks the option of federal compensation

in exchange for a waiver of their rights to file a civil action for damages resulting from the events of September 11. See Air Stabilization Act § 405(c)(3)(B)(i).

Section 408(a), as amended by Section 201(b) of the Aviation Security Act, limits the liability for the events of September 11 of: the two air carriers (United and American Airlines) involved in the attacks, the aircraft manufacturers, the airport sponsors, all property owners in the World Trade Center, and the City of New York.[1] The types of damages limited include compensatory and punitive damages, contribution, or indemnity. Generally, liability is limited to the amount of insurance carried by the entity at the time of the attack.

Section 408(b) includes two jurisdictional provisions. The first, Section 408(b)(1), creates an exclusive federal cause of action for "damages arising out of the hijacking and subsequent crashes" of the aircraft used in the September 11 attacks. Section 408(b)(2) identifies the substantive law to be applied "in any such suit" as "the law, including choice of law principles, of the State in which the crash occurred," unless that law is inconsistent with or preempted by federal law.

Section 408(b)(3), the second jurisdictional provision and the one at issue here, vests exclusive jurisdiction in the Southern District of New York as follows:

> (3) JURISDICTION.—The United States District Court for the Southern District of New York shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001.

---

1. Section 408(c) excludes those involved in the hijacking and certain air transportation security businesses and personnel from the limitations on liability.

Air Stabilization Act § 408(b)(3). The Aviation Security Act, in an amendment to Section 408(c) passed after this action began, excludes from the exclusive jurisdiction provision of Section 408(b)(3) civil actions to recover collateral source obligations. Aviation Security Act § 201(b)(3).

b) *Arguments of the Parties*

CLA argues that the plain language of Section 408(b)(3) confers subject matter jurisdiction over the present dispute. Appellant adds that the differences in language between Sections 408(b)(3) and 408(b)(1) and (2) support its interpretation. First, it notes that Section 408(b)(1) is limited to claims for "damages arising out of" the events of September 11, whereas Section 408(b)(3) encompasses "all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to" the attacks. *See* Appellant's Br. at 21. CLA infers, therefore, that the actions covered by Section 408(b)(3) entail broader categories than those described in Section 408(b)(1). Second, appellant argues that Section 408(b)(2)'s qualifying phrase "in any such suit" indicates that the types of claims covered by Section 408(b)(3), which lacks this qualifying phrase, are broader than the damages actions created by Section 408(b)(1). *See* Appellant's Br. at 21–22.

CR argues that Section 408 was intended to provide a claim only for direct victims of the September 11 attacks, not reinsurers with a contract dispute. It notes that Section 408 is located in the portion of the Air Stabilization Act establishing the Victim Compensation Fund and asks us to infer from this location a Congressional intent to create a federal claim only for the defined class of claimants [2] who seek tort damages through litigation instead of compensation through the Fund. *See* Appellee's Br. at 24–25. Accordingly, appellee argues, Section 408(b)(3) is limited to suits brought under the federal cause of action established in Section 408(b)(1). *See* Appellee's Br. at 25.

CR also argues that the amendment to Section 408(c) excluding actions to recover collateral source obligations, *see* Aviation Security Act § 201(b)(3), constitutes an explicit removal of jurisdiction over the present claim under Section 408(b)(3). *See* Appellee's Br. at 32–35. A collateral source is defined under the Act to mean "all collateral sources, including life insurance, pension funds, death benefit programs, and payments by Federal, State, or local governments related to the terrorist-related aircraft crashes of September 11, 2001." Air Stabilization Act § 402(4). In that regard, appellee notes that appellant had originally—pre-amendment—charac-

---

**2.** Under the statute, an eligible claimant is defined as:

  (A) an individual who—

  (i) was present at the World Trade Center, (New York, New York), the Pentagon (Arlington, Virginia), or the site of the aircraft crash at Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and

  (ii) suffered physical harm or death as a result of such an air crash;

  (B) an individual who was a member of the flight crew or a passenger on American Air-

lines flight 11 or 77 or United Airlines flight 93 or 175, except that an individual identified by the Attorney General to have been a participant or conspirator in the terrorist-related aircraft crashes of September 11, 2001, or a representative of such individual shall not be eligible to receive compensation under this title; or

  (C) in the case of a decedent who is an individual described in subparagraph (A) or (B), the personal representative of the decedent who files a claim on behalf of the decedent.

Air Stabilization Act § 405(c)(2)(A)-(C).

terized its claim for indemnification of life insurance and death benefits as an action to recover "collateral source compensation" from appellee. J.A. at 67; Appellee's Br. at 32. Appellant counters that the jurisdictional exclusion does not apply because appellee is not a traditional collateral source such as insurance for a tort victim. *See* Appellant's Br. at 29 n. 4.

c) *Decision*

■ Appellant's complaint asserts a breach of contract claim. It does not allege that any claim or defense arising in the action will require adjudication of any issue of law or fact that concerns the events of September 11. CLA alleges only that those events have increased the amount of its total losses under reinsurance contracts. The relationship of CLA's breach of contract claim to the events of September 11 is, therefore, solely one of "but for" causation: "but for" September 11, CLA would have had fewer losses to pay.

The contracts in question are indemnification contracts spreading the risk of loss under upstream primary insurance policies and requiring proof only of losses under those policies. Whether the losses were the result of the events of September 11, ordinary mortality, common fires, refinery explosions, auto accidents, or a flu epidemic is irrelevant to CLA's action. Thus, while the terrorist attacks of September 11 are alleged as a "but for" cause of the contract dispute, the actual events of that day are irrelevant to a resolution of the dispute, even though the insurance losses were caused in part by them. Nor is it alleged that appellee will raise defenses involving those events that would argu-

ably, *see* Note 5 *infra,* trigger jurisdiction under Section 408(b)(3).

■ We need not address the broad arguments advanced by the parties or delineate the precise contours of Section 408(b)(3)'s jurisdictional grant because it is clear that appellant's complaint does not trigger that grant. It is true that the language of the statute is broad and that where the meaning of a statute's terms are unambiguous, the plain meaning of the statute controls its interpretation, *see In re Venture Mortgage Fund, L.P.,* 282 F.3d 185, 188 (2d Cir.2002). However, where statutory language is ambiguous a court may resort to the canons of statutory interpretation and to the statute's legislative history to resolve the ambiguity. *See Auburn Housing Auth. v. Martinez,* 277 F.3d 138, 143–44 (2d Cir.2002); *Castellano v. City of New York,* 142 F.3d 58, 67 (2d Cir.1998) ("Where the language is ambiguous, [courts] focus upon the 'broader context' and 'primary purpose' of the statute.") (citations omitted). Finally, when a statute creates jurisdiction in a federal court, courts must construe the statute "with precision and with fidelity to the terms by which Congress has expressed its wishes." *Bread Political Action Comm. v. Fed. Election Comm'n,* 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982) (citation omitted).

We note at the threshold that appellant's jurisdictional theory is not simply that its claim *can* be brought in the Southern District of New York. Because Section 408(b)(3) provides exclusive jurisdiction, CLA's theory necessarily is that its breach of contract action *must* be brought in the Southern District and cannot be brought anywhere else, at least in the United States.[3] In that context, the words "all

---

**3.** In fact, CLA argues that Section 408(b)(3) overrides an arbitration clause in its agree- ments with CR.

actions brought for any claim . . . resulting from or relating to" the events of September 11, 2001, must be read either to draw the jurisdictional line short of litigation involving economic losses that are related to those events only as a "but for" consequence or to lead to absurd results.

For example, a bank in Chicago may have provided financing to an Illinois manufacturer that supplied goods to a retailer in the World Trade Center. If the retailer had obtained substantial credit from the manufacturer and failed to pay its debts because of the terrorist acts, that failure might cause the manufacturer to default on its obligations to the bank. A "but for" reading would compel the bank to sue on the manufacturer's debt only in the Southern District of New York. For an example closer to home, a reinsurer may become insolvent for reasons entirely unrelated to September 11 and primary insurers might be forced to litigate their claims to indemnification from the reinsurer, including indemnification for losses directly caused by the terrorist acts of September 11, in the reinsurer's insolvency proceedings. A "but for" reading of Section 408(b)(3) would suck those proceedings into the Southern District of New York. Congress cannot have intended the absurd result of requiring every lawsuit involving economic losses traceable to September 11 to be brought in the Southern District.[4]

In any event, the language in question does not plainly lead to that result. Appellant's argument for a "but for" reading of Section 408(b)(3) ignores a textual ambiguity. "Claim" is a word used in many ways in legal contexts and seems to be used here to mean "cause of action," "legal

theory," or "factual theory." It is followed by the parenthetical "(including any claim for loss of property, personal injury, or death.)," which appears in this statutory context to refer to losses suffered by the immediate victims of the terrorist attacks. Usually, under the practice of *ejusdem generis,* general language in an enumeration of specific illustrations is construed in a fashion that limits the general language to the same class of matters as the things illustrated. *See United States v. Carrozzella,* 105 F.3d 796, 800 (2d Cir. 1997). Application of *ejusdem generis* here would, therefore, require that, for purposes of Section 408(b)(3), "claim" have a more direct connection to the events of September 11 than is provided by an action for a "but for" economic loss. The statutory language does not, therefore, compel the result claimed by appellant.

Courts should not read statutory language to lead to absurd results even if that language does have a clear literal meaning. *See Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 297 (2d Cir. 1998). Moreover, the language here is ambiguous, and we must turn to the legislative context and history to resolve the ambiguity. *See Auburn Housing,* 277 F.3d at 143–44; *Castellano,* 142 F.3d at 67.

The purpose of Section 408(b)(3), in vesting exclusive jurisdiction in the Southern District for "all actions brought for any claim . . . resulting from or relating to" the attacks, was to ensure consistency and efficiency in resolving the many expected actions arising from the events of September 11. Senator McCain stated that a single forum was needed "to provide some sense to the litigation," 147 Cong.

---

4. *The perversity of appellant's position is underlined by Congress's explicit exemption from the exclusive jurisdictional provision of Section 408(b)(3) of actions to recover collateral source obligations. The "but for" read-* ing would result in suits for losses against primary insurers being brought wherever jurisdiction and venue were proper, while suits between reinsurers over the same losses would be confined to the Southern District.

Rec. S9594 (Sept. 21, 2001), and Senator Hatch explained that the consolidation of cases in a single district court would provide "some consistency in the judgments awarded," 147 Cong. Reg. S9595 (Sept. 21, 2001).

Requiring a single forum for "all actions brought for any claim ... resulting from or relating to" the events of September 11 must have as its goal the avoidance of the undesirable effects that litigation of September 11 claims in the various state and federal courts would inevitably produce. These effects might include: inconsistent or varying adjudications of actions based on the same sets of facts; adjudications having a preclusive effect on non-parties or substantially impairing or impeding non-parties' abilities to protect their rights; victims or their survivors without any possibility of recovery when the limits of liability have been exhausted in other lawsuits; the difficulties in mediation when defendants are sued in multiple state and federal courts, and the waste of private and judicial resources in multiple state and federal courts hearing cases involving the same factual and legal issues. Appellant's complaint raises none of these problems.

Moreover, there are obvious counterproductive effects if every "but for" factual "claim" must be brought in the Southern District of New York. Vast numbers of claims that have no common issues of law or fact will be brought, and worse, a number of those actions will be adjudicated without addressing any issue of law or fact that even mentions the events of September 11. This potential tsunami of actions will overwhelm the Southern District and greatly impair efficiency in resolving claims with issues of law and fact that do directly involve the events of September

11. The effect of a reading of Section 408(b)(3) that includes all "but for" cases will not be limited to the Southern District of New York. Vast numbers of civil defendants in courts other than the Southern District will be able to claim that they have been sued in a court that lacks jurisdiction.

Because Section 408(b)(3) does not provide subject matter jurisdiction over this dispute, we cannot reach the merits of CR's argument that Section 408(b)(3) violates the Constitution's limits on Congress's power to confer jurisdiction on the federal courts under Article III. Given the ambiguity of the statute, however, we do note that a statute should be construed to avoid raising serious doubts as to its constitutionality, if such a construction is fairly possible, see *Califano v. Yamasaki,* 442 U.S. 682, 693, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *United States v. Jakobson,* 325 F.2d 409, 415 (2d Cir.1963), and that construing Section 408(b)(3) to encompass all claims for economic loss that would not have been suffered "but for" the September 11 events raises such doubts, see *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 491–97, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Mizuna, Ltd. v. Crossland Fed. Sav. Bank,* 90 F.3d 650, 655–57 (1996).

To conclude, the "all actions brought for any claim ... resulting from or relating to" language in Section 408(b)(3) does not vest the Southern District of New York with jurisdiction over actions involving economic losses that would not have been suffered "but for" the events of September 11 but otherwise involve no claim or defense [5] raising an issue of law or fact involving those events. We emphasize that our decision is limited to denying jurisdiction over this category of cases and does

---

**5.** We need not address the difficult questions that might arise in a case in which the complaint raises for adjudication no issue of law or fact relating to September 11, but the defense is based in whole or in part on such an issue.

not purport to go further or to establish affirmatively jurisdiction under Section 408(b)(3) for any particular type of claim.

We therefore affirm.