407 F.3d 105
 Lucy VIRGILIO, Personal Representative of Lawrence Virgilio, Plaintiff,
Geraldine Halderman, Personal Representative of Lt. David Halderman, Eileen Tallon, Personal Representative of Sean Patrick Tallon, Gergard J. Prior, Personal Representative of Kevin M. Prior, Catherine Regenhard, Personal Representative of Christian Regenhard, Maureen L. Dewan-Gilligan, Personal Representative of Gerard P. Dewan, James Boyle, Personal Representative of Michael Boyle, Barbara Boyle, Personal Representative of Michael Boyle, Edward Sweeney, Personal Representative of Brian Sweeney, Gerald Jean-Baptiste, Co-Personal Representative of Gerard Jean Baptiste, Jr., Alexander Santora, Personal Representative of Christopher Santora, Maureen Santora, Personal Representative of Christopher Santora, Raffaela Crisci, Personal Representative of John A. Crisci and Patricia Deangelis, Personal Representative, Plaintiffs-Appellants,
v.
CITY OF NEW YORK and Motorola, Inc., Defendants-Appellees.
Docket No. 04-1942-CV.
 United States Court of Appeals, Second Circuit.
 Argued: March 16, 2005.
 Decided: April 29, 2005.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Eric M. Lieberman (Carrie Corcoran, Keith M. Donoghue, on the brief) Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York, New York (Richard Salem, Salem Law Group, Tampa, Florida, William A. Reppy, Jr., Charles L.B. Lowndes Emeritus Professor of Law, Duke University School of Law, Durham, North Carolina; William Van Alstyne, Lee Professor of Law, Marshall-Wythe School of Law, Williamsburg, Virginia, on the brief), for Plaintiffs-Appellants.
 Belina Anderson (Michael A. Cardozo, Corporation Counsel, Kenneth A. Becker, on the brief) Corporation Counsel of the City of New York, New York, New York, for Defendant-Appellee the City of New York.
 Michael D. Schissel, Arnold & Porter LLP, New York, New York, for Defendant-Appellee Motorola, Inc.
 Before: NEWMAN, STRAUB, and WESLEY, Circuit Judges.
 WESLEY, Circuit Judge.
 
 
 1
 In a series of tragic and terrifying attacks on September 11, 2001, terrorists killed thousands in Pennsylvania, Virginia, and New York, caused extensive damage to the Pentagon, and brought about the collapse of the North and South Towers of the World Trade Center ("WTC"). As with other catastrophes, true heros responded, not the least among them the brave firefighters, police, and first-response units of the City of New York. Plaintiffs are the personal representatives of firefighters who lost their lives in responding to the WTC following the attacks. Plaintiffs' complaint focuses on the failure of radio-transmission equipment in the North and South Towers that prevented firefighters from receiving evacuation orders before the Towers' collapse. Plaintiffs commenced this action for wrongful death against New York City (the "City") on December 22, 2003, and filed an amended complaint as of right on January 20, 2004, that added Motorola, Inc. ("Motorola") as a defendant.
 
 
 2
 Plaintiffs claim that Motorola negligently and intentionally provided the City with radio-transmission communication equipment for firefighters that Motorola knew to be ineffective in high-rise structures like the Towers of the WTC, that Motorola made fraudulent material misrepresentations to secure contracts with the City, and that those acts and representations caused decedents' deaths.[1] Plaintiffs also press a series of wrongful death claims against the City based upon its alleged failure to meet duties imposed on the City under New York law to provide adequate and safe radio-transmission equipment.[2] Finally, in Count 8 of the Amended Complaint, plaintiffs allege that the City and Motorola engaged in concerted action in an attempt to deprive firefighters of adequate protection and to "engage in fraudulent misrepresentations and deceitful conduct."
 
 
 3
 Shortly after the disaster, Congress passed the Air Transportation Safety and System Stabilization Act (the "Air Stabilization Act" or the "Act"). Pub.L. No. 107-42, 115 Stat. 230 (2001). The statute limited liability for the air carriers involved in the tragedy to their insurance coverage, see Air Stabilization Act § 408(a); created the Victim Compensation Fund (the "Fund") to provide no-fault compensation to victims who were injured in the attacks and to personal representatives of victims killed in the attacks, see id. §§ 402(3), 405(a)(1), (b), (c); and provided an election of remedies — all claimants who filed with the Fund waived the right to sue for injuries resulting from the attacks except for collateral benefits, see id. § 405(c)(3)(B)(i). On November 19, 2001, the Act was amended by the Aviation and Transportation Security Act (the "Aviation Security Act"). Pub.L. No. 107-71, 115 Stat. 597 (2001). Significantly, the amendments extended liability limits to aircraft manufacturers, those with a proprietary interest in the WTC, and the City of New York, see id. § 201(b), while allowing Fund claimants to sue individuals responsible for the attacks notwithstanding the waiver, see id. § 201(a).
 
 
 4
 Under the Act, the final date by which claimants could submit claims to the Fund was December 22, 2003. See Air Stabilization Act §§ 405(a)(3), 407; 28 C.F.R. 104.62. The Special Master appointed to oversee the Fund, Kenneth R. Feinberg, extended the filing date to January 22, 2004, for those claimants who previously submitted incomplete claims. The Special Master promulgated an application form that notified claimants of the waiver provision and required claimants to sign an acknowledgment of waiver. The acknowledgment of waiver tracked the language of the statutory waiver provision.
 
 
 5
 A number of September 11-related cases were consolidated before Judge Hellerstein.[3] On December 19, 2003, Judge Hellerstein issued an order addressing when the waiver via assertion of Fund claims would become effective. See In re September 11 Litig., 21 MC 97, 2003 WL 23145579 (S.D.N.Y. Dec.19, 2003). Judge Hellerstein held that "submission" of Fund claims — triggering the waiver provision — occurs on the earlier of when a Fund filing is substantially complete as determined by the Special Master or January 22, 2004. Id. at *2.
 
 
 6
 A day after filing their amended complaint, plaintiffs moved by Order to Show Cause on January 21, 2004, asking that the court permit them to continue their lawsuit against defendants despite having filed claims with the Fund. Alternatively, plaintiffs asked the court to stay Judge Hellerstein's earlier orders — which required that cases brought by 9/11 victims with Fund awards pending as of January 22, 2004, be dismissed — or to place their case on the suspense docket of the consolidated In re September 11 Litigation docket until a general consolidated conference previously set by Judge Hellerstein for February 6, 2004, took place.[4] Because of the January 22nd deadline for completing previously filed but incomplete Fund claims, Judge Haight held a hearing on the 22nd on the motion and issued a ruling from the bench finding that the statute's waiver provision barred the suit against the City or Motorola: "`the plaintiffs' claims against both the City and Motorola are subject to the limitation on civil actions provided for in Section 405(c)(3)(B)(i) of the statute.'" Virgilio v. Motorola, Inc., 307 F.Supp.2d 504, 514 (S.D.N.Y.2004) (Haight, J.) (quoting transcript).
 
 
 7
 On January 29, 2004, Judge Haight issued a detailed decision that set forth his reasons for finding that plaintiffs' claims were barred as a result of their decision to file with the Fund. See id. at 514-20. Although the court denied the relief requested in the Order to Show Cause on a finding that the waiver provision barred plaintiffs' claims, it did not dismiss the amended complaint as defendants had yet to file answers and had little time to oppose the Order to Show Cause other than through argument of counsel before Judge Haight. Because plaintiffs' case raised 9/11 claims similar to those in In re September 11 Litigation, Judge Haight transferred the case to Judge Hellerstein's "suspense docket" of the consolidated In re September 11 Litigation docket. Id. at 521.[5]
 
 
 8
 On January 30, 2004, the next day, the City moved to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) or for summary judgment on several grounds, including the Act's waiver provision; the expiration of the statute of limitations for wrongful death actions against municipalities; and plaintiffs' failure to serve timely notices of claim against the City. Motorola moved to dismiss the amended complaint on the ground of waiver.
 
 
 9
 Judge Hellerstein dismissed the complaint in an unpublished decision. See Virgilio v. Motorola, Inc., No. 03 Civ. 10156(AKH), 2004 WL 433789 (S.D.N.Y. Mar.10, 2004). The district court adopted Judge Haight's decision noting that "the waiver provision applies to [ ] all of the claims against Motorola and the City of New York .... As plaintiffs have elected their remedy, they have also waived the right to bring a civil action `for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001.'" Id. at *2 (quoting Air Stabilization Act § 405(c)(3)(B)(i)).
 
 
 10
 Plaintiffs appealed, and we now affirm.
 
 Discussion
 
 11
 When confronted with an appeal from the dismissal of a complaint, we review the matter anew, see, e.g., Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir.2000), and take as true the complaint's allegations. A complaint may be dismissed for failure to state a claim only if there are no legal grounds upon which relief may be granted. See Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir.2005); Fed.R.Civ.P. 12(b)(6). The task at hand reduces itself to examining the statute and assessing its impact on this case.
 
 A. Statutory Scheme
 
 12
 The Air Stabilization Act establishes the Fund and delegates to the Attorney General the authority to appoint a Special Master to oversee victim compensation. See Air Stabilization Act §§ 401-09. As Congress noted, one purpose of the Fund is "to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001." Id. § 403. However, eligibility for Fund payment "is conditioned upon a waiver by claimants of `the right to file any civil action' in state or federal court" except for civil actions against those responsible for the attack or to recover collateral source obligations. Schneider v. Feinberg, 345 F.3d 135, 139 (2d Cir.2003) (quoting Air Stabilization Act § 405(c)(3)(B)). Because the Act seeks to provide quick no-fault compensation decisions for victims while capping the litigation exposure of frontline defendants, it is quite clear that the Act's "general purpose is to protect the airline industry and other potentially liable entities from financially fatal liabilities while ensuring that those injured or killed in the terrorist attacks receive adequate compensation." Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG, 335 F.3d 52, 55 (2d Cir.2003) (citing 147 Cong. Rec. S9594 (daily ed. Sept. 21, 2001) (statement of Sen. McCain)).
 
 
 13
 Sections 405 and 408(b) set forth general guidelines and requirements for Fund claims and create a federal cause of action for claims relating to 9/11. See id. §§ 405, 408(b). Section 405(c)(3)(B)(i) contains the waiver provision central to this case:
 
 
 14
 (B) LIMITATION ON CIVIL ACTION. —
 
 
 15
 (i) IN GENERAL. — Upon the submission of a claim under this title, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001. The preceding sentence does not apply to a civil action to recover collateral source obligations, or to a civil action against any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act.
 
 
 16
 (as amended by the Aviation Security Act, § 201(a)).
 
 
 17
 While section 405 creates a system for determining Fund eligibility outside of the litigation context, section 408 funnels all civil litigation for actions "resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001" into the Southern District of New York by granting that court "original and exclusive jurisdiction" over such actions, id. § 408(b)(3), and provides that the "substantive law for decision in any such suit shall be derived from the law ... of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law," id. § 408(b)(2). As noted above, section 408 caps the liability of air carriers, aircraft manufacturers, holders of proprietary interests in the WTC, and the City. See id. § 408(a), 408(a)(1), 408(a)(3); Aviation Security Act § 201(b).
 
 
 18
 B. Statutory Waiver Provision: Air Stabilization Act § 405(c)(3)(B)(i)
 
 
 19
 We agree with the district court that under the plain language of the statute, claimants who have filed claims with the Fund have waived "the right to file a civil action ... for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001" and that the waiver bars claims for "damages sustained" against non-airline defendants. We affirm the district court's determination and find plaintiffs' claim barred by their election of remedies.
 
 
 20
 Plaintiffs assert that the waiver provision does not apply to claims against the defendants because the correct interpretation of that section bars suits against only the airplane-transportation industry. Plaintiffs present three arguments to support their contention: they assert that the district court misinterpreted Congress's purpose in enacting the Air Stabilization Act; that the waiver provision should be examined in the context of its relationship to the statute and subsequent amendments to the Air Stabilization Act; and that the legislative history of the waiver provision supports a narrower interpretation of that provision than that employed by the district court. The City and Motorola counter that the plain language unambiguously bars the current suit and that the legislative history of the Act further supports their view.
 
 
 21
 When interpreting a statute, the "first step ... is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and `the statutory scheme is coherent and consistent.'" Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). Further, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341, 117 S.Ct. 843 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) and McCarthy v. Bronson, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991)). Thus, we begin with the language of the statute itself.
 
 
 22
 In our view, the waiver provision is unambiguous. The language of the waiver provision clearly states that Fund claimants waive their right to bring civil actions resulting from any harm caused by the 9/11 attacks: "[u]pon the submission of a claim ..., the claimant waives the right to file a civil action ... in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001." Air Stabilization Act § 405(c)(3)(B)(i). The waiver provision plainly requires litigants to choose between risk-free compensation and civil litigation. If this waiver provision is ambiguous as plaintiffs suggest, few if any statutory provisions could be viewed as clear.
 
 
 23
 The overall structure of the Act highlights two predominate concerns: to insulate the airline industry from massive — virtually limitless — liability arising from the sudden and devastating acts of wanton cruelty on 9/11 and to provide an adequate no-fault system of compensation to victims. See Canada Life Assurance Co., 335 F.3d at 55. The statute balanced the certainty of a no-fault recovery against the relinquishment of one's right to bring a federal action — created by the statute — for injuries arising from the disaster. See Schneider, 345 F.3d at 139; Canada Life Assurance Co., 335 F.3d at 55 (noting Fund compensation "in exchange for a waiver of their rights to file a civil action"); cf. § 408(b) (creating a federal cause of action for "damages arising out of the hijacking"). Without the Act, victims and their families could seek compensation only through litigation in state or federal courts. The terrorists carried out four separate attacks in three locations — two of which involved the damage or destruction of government and office buildings and a concomitant loss of lives within those structures and the areas adjacent to them. Thus, the number of plaintiffs, possible defendants, and theories of recovery were as diverse as the confluence of misfortunes that befell each victim. Moreover, the litigation scatter pattern presented the possibility of lawsuits in state and federal courts nationwide.[6]
 
 
 24
 While the potential liability to the air carriers and airplane manufacturers involved was monumental, the prospect for recovery by the victims and their families was not certain. A verdict against the air carriers or other potential defendants, such as the City or Motorola, was not guaranteed. In addition, the scope of liability was so substantial that the prospect of Bankruptcy Court for the air carriers was real. In order to provide the certainty of recovery for victims and their families, Congress created the Fund, which provides loss-based awards without an assessment of fault or responsibility for the loss.[7] All the victims or their representatives need establish is presence at the site of a 9/11 attack and physical injury or death as a result of the attacks. See Air Stabilization Act § 405(c)(2).
 
 
 25
 The Act centralizes the victims' litigation claims in one federal court while applying the substantive state law of the locus of the injury. It recognizes that the airline industry might not be able to withstand the litigation tidal wave the attacks would create. It also recognizes that such an onslaught would likely leave many victims and their families waiting years, while blame for the attacks and the resulting injuries is parsed out among hundreds of defendants leaving plaintiffs to recover only a small pro rata share of a fair award in Bankruptcy Court. Thus, the statute carries out a careful balancing of a number of important interests. It gives claimants a reasonable choice between an administrative claim or litigation centralized in one court in which the primary defendants would have limits to their exposure. In our view, there is no inconsistency in compensating victims and their families at a price of complete litigation peace.
 
 
 26
 It is clear to us that plaintiffs' claims are within the scope of the waiver provision. Here, plaintiffs damages arose "as a result" of the terrorist-related attacks. Plaintiffs assert that the waiver should not reach defendants' alleged tortious conduct. In plaintiffs' view, defendants' acts independently caused plaintiffs' injuries. But, in fact, the injuries to plaintiffs and their loved ones resulted from a series of interrelated events that began with the terrorist attack. Even assuming independent, successive tortious acts by both the terrorists and defendants, as we must on this motion to dismiss, we are hard pressed to find plaintiffs' damages did not result — at least in part — from the terrorist attacks.
 
 
 27
 Indeed, plaintiffs overlook the very language of the statute that defines their eligibility for compensation for the Fund. The Act provides that anyone, or their relative, who was present at and injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001, may file a claim with the Fund. See Air Stabilization Act § 405(c)(2). In our view, plaintiffs cannot embrace the statute's broad view that many people, in widely differing circumstances, died "as a result" of the attacks while simultaneously constricting the same language in the waiver to include only the airlines. Compare id. § 405(c)(2) with id. § 405(c)(3)(B)(i).
 
 
 28
 Plaintiffs also contend that amendments to the Air Stabilization Act reveal the limited scope of the waiver provision. This argument continues to ignore the plain language of the waiver and confuses the effect of the amendments. On November 19, 2001, Congress amended the Air Stabilization Act in two significant respects.[8] Section 201(a) of the Aviation Security Act altered the exception in the waiver provision to allow "civil action[s] against any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act." Thus, Fund claimants have not waived their right to sue those responsible for the attacks. Certainly, had Congress chosen to constrict the scope of the waiver further, as plaintiffs would have us do, it could have done so — it did not.
 
 
 29
 The amendment also altered section 408. As originally enacted, this section capped the airlines' liability for compensatory and punitive damages at the level of insurance carried by the airlines. See Air Stabilization Act § 408(a). Thus, even if a plaintiff chose to pursue civil litigation over filing a Fund claim, the airlines' exposure in federal court would not exceed their coverage. The amendment brought the City (and others) within the protection of the liability cap: Liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity arising from the terrorist-related aircraft crashes of September 11, 2001, against the City of New York shall not exceed the greater of the city's insurance coverage or $350,000,000. If a claimant ... submits a claim under section 405, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, including any such action against the City of New York.
 
 
 30
 Aviation Security Act § 201(b)(2) (amending Air Stabilization Act § 408(a) and adding § 408(a)(1), (3)).[9]
 
 
 31
 Plaintiffs contend that the amendment's repetition of the waiver language in the liability-limiting section indicates that the protection of section 405's waiver provision is limited to actions against airline industry-related defendants. They argue that had the waiver included the City before the amendment, there would be no need to mention the waiver when limiting the City's exposure in federal court. In essence, plaintiffs would define the sweep of the waiver by the scope of the limitation of liability sections of the statute. That ignores the fact that the language of the waiver is broad and unlimited while the limitation of liability provision is specific. It also ignores the purpose and effect of each provision.
 
 
 32
 Limitations on liability are just that. They are caps on recoveries in litigation against defendants facing primary, stunning exposure by nonclaim-filing plaintiffs. The waiver provision on the other hand seeks to force a choice between a risk-free claim with the Fund or a lawsuit in federal court. Thus, a plaintiff who elects litigation still faces the prospect that the primary defendants will exhaust their coverage — and their liability — before plaintiff achieves a verdict, while a plaintiff choosing the certainty of the Fund does so at the cost of releasing all his claims with only limited exceptions.
 
 
 33
 Contrary to plaintiffs' argument, neither the extension of limited liability to the City nor the inclusion of waiver language in that extension support the assertion that the waiver provision of section 405 protects only the airlines or the air-transportation industry. The restatement of the waiver did not pronounce a new extension of the waiver to the City, nor did it introduce an ambiguity into the clear and concise waiver provision. The clause notes that the filing of a claim waives one's right to bring an action in federal court for injuries resulting — in part — from the terrorist attacks against anyone, including the City, other than collateral-source obligors or those responsible for the attacks. See Air Stabilization Act § 408(b)(3) (as amended by Aviation Security Act § 201(b)). In our view, the amendments reinforce the view that the plain and broad language of section 405(c)(3)(B)(i) already encompassed any claim for damages sustained as a result of the terrorist-related aircraft crashes.[10]
 
 
 34
 C. Scope of Waiver for "Damages Sustained" and Viability of Any Remaining Claim to Punitive Damages Under New York Law
 
 
 35
 Plaintiffs assert that even if the waiver provision applies to the City and Motorola, the waiver refers only to compensatory damages. They contend that under New York law they may maintain an action solely for punitive damages against the City and Motorola. Defendants counter that this argument, not offered below, is waived; that the plain meaning of "damages sustained" bars any civil recovery; and that New York law bars plaintiffs from suing solely for punitive damages without a concomitant claim for compensatory damages.
 
 
 36
 Defendants are correct that plaintiffs failed to raise any argument about the scope of the waiver as it relates to a claim for punitive damages. "In general we refrain from passing on issues not raised below." Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 103 (2d Cir.2004) (citing Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). Despite the general rule, however, this Court retains broad discretion to consider such issues because waiver rules are prudential and not jurisdictional. Id. (citing Lo Duca v. United States, 93 F.3d 1100, 1104 (2d Cir.1996)). This Court "may rule on issues not raised in the district court... when the issues are solely legal ones not requiring additional factfinding." Id. (citing Baker v. Dorfman, 239 F.3d 415, 420-21 (2d Cir.2000)). Plaintiffs' arguments present pure questions of law — the meaning of a statutory term and New York's law of punitive damages. In light of the potential for others to raise similar arguments, we see no need to delay the law-based decision.
 
 
 37
 Plaintiffs rely on several cases interpreting statutory phrases similar to "damages sustained" as identifying only "compensatory damages."[11] Compensatory damages are just that; they compensate the injured victim for injuries actually endured. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (quoting Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)). Thus legislation granting a prospective plaintiff a claim for damages sustained would seem to imply that the statute authorized only a claim to be made whole. Plaintiffs contend that while the waiver provision extinguishes claims, it does so only as to claims for damages sustained — claims for compensatory damages. Plaintiffs' argument has some appeal; however, it overlooks the essential nature of punitive damages under New York law.
 
 
 38
 The Act invokes the substantive law of the State of injury. See Air Stabilization Act § 408(b)(2). Thus, all parties agree that New York law decides plaintiffs' entitlement to punitive damages. While compensatory damages recompense for one's injuries, punitive damages under New York law serve an entirely different purpose. Punitive damages are invoked to punish egregious, reprehensible behavior. See Walker v. Sheldon, 10 N.Y.2d 401, 404-05, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961). Although punitive damages must have some relationship to the conduct for which the punishment is imposed, they do not seek to make the injured victim whole. See Garrity v. Lyle Stuart, Inc., 40 N.Y.2d 354, 357-58, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976); see also Rocanova v. Equitable Life Assurance Soc'y of U.S., 83 N.Y.2d 603, 616-17, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994). They serve as an enforcement mechanism invoked by private citizens to accomplish public policy objectives — responsible behavior in the marketplace or where otherwise appropriate. See Walker, 10 N.Y.2d at 404, 223 N.Y.S.2d 488, 179 N.E.2d 497; Rocanova, 83 N.Y.2d at 613, 612 N.Y.S.2d 339, 634 N.E.2d 940. But, while punitive damages are not curative in nature, under New York law they cannot be invoked without some compensatory injury.[12] See Rocanova, 83 N.Y.2d at 616-17, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994); see also Hubbell v. Trans World Life Ins. Co., 50 N.Y.2d 899, 901, 430 N.Y.S.2d 589, 408 N.E.2d 918 (1980). Once a claim for compensatory injuries is barred, the possibility of a punitive award is likewise relinquished.
 
 
 39
 In Rocanova, the New York Court of Appeals addressed the relationship between the viability of a claim underlying a request for compensatory damages and the availability of the remedy of punitive damages. See 83 N.Y.2d at 616, 612 N.Y.S.2d 339, 634 N.E.2d 940. Plaintiff alleged four causes of action based on "unfair claim settlement practices" by the defendant insurance company. Id. Plaintiff entered into a settlement that released defendant from "all debts, claims, demands, damages, actions and causes of action" related to the facts at issue in the case. Id. The court held that where the cause of action for compensatory damages that served as the predicate for punitive damages was barred by a release, no claim for punitive damages would lie. See id. The court was clear: "in light of our conclusion that the release bars [plaintiff's] remaining causes of action, [plaintiff] cannot recover punitive damages since [plaintiff] is unable to assert an underlying cause of action upon which a demand for punitive damages can be grounded. A demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action." Id. (emphasis added).
 
 
 40
 In our view the statutorily imposed waiver — set out in the acknowledgment each plaintiff signed when they filed their Fund claim — is the functional equivalent of the satisfaction and release in Rocanova. Under the language of the statute, plaintiffs have waived their right to file "a civil action" for damages sustained. Plaintiffs had a right to seek damages to redress the wrongs they and their loved ones suffered through a civil action against defendants. That right encompassed compensatory damages and, if appropriate, punitive damages for egregious conduct. But once the compensatory claim was satisfied, the parasitic claim for punitive damages was also extinguished.[13] Adopting plaintiffs' position would require us to ignore well-established New York law and to abrogate the clear language of Congress that once a Fund claim is made, the universe of potential defendants is constricted to only terrorists responsible for the carnage and collateral-source providers.
 
 D. Plaintiffs' Due Process Arguments
 
 41
 Lastly, the plaintiffs contend the district court erred in failing to conduct a factual inquiry into whether each plaintiff made a knowing and voluntary waiver of their right to bring a civil action before filing Fund claims. Plaintiffs never raised this argument below. We decline to exercise our discretion to entertain it. Unlike the interpretation of the scope of the waiver provision or the viability of claims for punitive damages under New York law, plaintiffs' argument for why the district court should have conducted a factual inquiry into the "knowing and voluntary" nature of the waiver conflicts with the positions of the parties presented to Judge Haight or Judge Hellerstein; we will not entertain it. We have considered plaintiffs' remaining contentions and find them without merit for substantially the same reasons stated in the opinions issued by Judge Haight and Judge Hellerstein.
 
 
 42
 We close with a general observation. The events of September 11, 2001, changed this nation in ways that will not be fully understood for generations to come. However, the pain and sense of loss that the victims and their families feel need not wait the judgment of history — their anguish, we are sure, is a daily companion. As judges, we are not unmindful of the great sacrifice that many of New York's bravest men and women made on behalf of those who were trapped in the burning towers at Church and Vesey Streets. If Article III of the Constitution somehow gave us the power to turn back time and undo the disaster we would set to the task without reservation. Unfortunately, we have only the power to assess the law as it is given to us by Congress. Such is the nature of judging.
 
 Conclusion
 
 43
 For the foregoing reasons, the district court's order entered on April 12, 2004, dismissing the complaint is hereby AFFIRMED without costs.
 
 
 
 Notes:
 
 
 [1]
 Four Counts of the Amended Complaint allege specific torts against defendant Motorola. Count Four alleges a wrongful death claim based upon design defects in radio-transmission equipment provided by Motorola; Count Five alleges a claim for wrongful death for the failure to warn of shortcomings in the radio equipment; Count Six alleges a wrongful death claim due to fraudulent misrepresentation, and Count Seven alleges a wrongful death claim due to negligent misrepresentations
 
 
 [2]
 Three Counts of the complaint allege wrongful death for the breach of statutorily imposed duties by the City
 
 
 [3]
 One category encompassed cases alleging "wrongful death, personal injury, and property damage against the airlines, the airport security companies, the plane manufacturer, and the owners and lessees of the World Trade Center" under the captionIn re September 11 Litigation, No. 21 MC 97(AKH) (S.D.N.Y. filed Nov. 1, 2002); the other encompassed "cases alleging respiratory injuries against the City of New York, the Port Authority of New York and New Jersey, and the contractors that were engaged to demolish, cart away and clean up the debris of the destroyed buildings." In re World Trade Ctr. Disaster Site Litig., 270 F.Supp.2d 357, 362-363 & nn. 2-3 (S.D.N.Y.2003).
 
 
 [4]
 While the facts of this case are similar to those of cases consolidated before Judge Hellerstein inIn re September 11 Litigation, 21 MC 97(AKH), see In re World Trade Center Disaster Site Litig., 270 F.Supp.2d at 362-63 & n. 2, this case was assigned to Judge Berman by lot after plaintiffs filed the original complaint on December 22, 2003, see Virgilio v. Motorola, Inc., 307 F.Supp.2d 504, 507 (S.D.N.Y.2004). Judge Haight heard plaintiffs' Order to Show Cause submitted on January 21, 2004, sitting in Part I. See Virgilio, 307 F.Supp.2d at 507-09.
 
 
 [5]
 The "suspense docket" was created to deal with a statute of limitations problem faced by many 9/11 plaintiffs. Because the New York statute for wrongful death generally ran two years after death — i.e. September 11, 2003 — and because the Fund set a limitations period of December 22, 2003, plaintiffs faced a choice of whether to elect a claim under the Fund well in advance of the expiration date or whether to meet the statute of limitations for their wrongful death actionsSee N.Y. EST. POWERS & TRUST LAW § 5-4.1(1) (1999). The "suspense docket" stayed plaintiffs' filed claims while they evaluated whether to seek compensation through the Fund. New York amended the Estates Powers & Trust Law in 2003 to provide a two and a half year statute of limitations under § 5-4.1(1) for victims of the WTC attacks effective July 1, 2003. See id. (2005 Supp.); 2003 N.Y. LAWS, ch. 114 § 1.
 
 
 [6]
 See 147 Cong. Rec. S9594 (daily ed. Sept. 21, 2001) (statement of Sen. McCain) ("It is regrettable, but perhaps inevitable, that the unity that this terrorist attack has wrought will devolve in the courts to massive legal wrangling and assignment of blame among our corporate citizens.").
 
 
 [7]
 Senator McCain stated that the purpose of the Air Stabilization Act was:
 To ensure that the victims and families of victims who were physically injured or killed on September 11th are compensated even if courts determine that the airlines and any other potential corporate defendants are not liable for the harm; if insurance monies are exhausted; or are consumed by massive punitive damage awards or attorneys' fees, the bill also creates a victims' compensation fund. These victims and their families may, but are not required to, seek compensation from the Federal fund instead of through the litigation system.
 
 
 [147]
 Cong. Rec. S9594 (daily ed. Sept. 21, 2001) (emphasis added)
 
 
 [8]
 See Aviation Security Act, Pub.L. No. 107-71, 115 Stat. 597 (Nov. 19, 2001).
 
 
 [9]
 When Congress amended the Act in November 2001 it extended the liability cap not only to the City but also to aircraft manufacturers and persons with a proprietary interest in the WTCSee Aviation Security Act § 201(b).
 
 
 [10]
 Having concluded that the language of the statute is clear and unambiguous notwithstanding the subsequent amendments, we see no need to examine the statute's legislative history as plaintiffs urge us to doCf. Robinson, 519 U.S. at 340, 117 S.Ct. 843. We do note that the prior efforts of our Court in that regard weigh heavily against plaintiffs' contention. See Schneider, 345 F.3d at 139; Canada Life Assurance Co., 335 F.3d at 55.
 
 
 [11]
 Plaintiffs rely onLocal 20, Teamsters v. Morton, 377 U.S. 252, 260 & nn. 15-16, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), and In re Air Disaster at Lockerbie, Scotland, 928 F.2d 1267, 1280-83 (2d Cir.1991), overruled on other grounds Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217, 229, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Both cases dealt with the issue of whether the grant of a right to "damages sustained" or language similar to "damages sustained" included a right of recovery for punitive damages. Both courts limited recovery to compensatory damages.
 
 
 [12]
 Although this Court has previously considered the ability of a plaintiff to receive punitive damages despite a jury verdict in which no compensatory damages were explicitly awarded,see King v. Macri, 993 F.2d 294, 297-98 (2d Cir.1993), that case is of no help to plaintiffs for several reasons. King did not employ New York law; the case involved a section 1983 claim. Id. at 296-97. In King the jury was charged without objection that it could award punitive damages "regardless of whether plaintiff has established actual damages." Id. at 297. Finally, and most importantly, King involved a jury verdict, it did not extrapolate the effect of a release of a compensatory claim on the viability of a request for punitive damages arising out of the same conduct. See id.
 
 
 [13]
 We note that in their briefs and at argument plaintiffs relied onMulder v. Donaldson, Lufkin & Jenrette, 208 A.D.2d 301, 308, 623 N.Y.S.2d 560 (1st Dep't 1995), for the proposition that plaintiffs may validly assert a claim for punitive damages even after waiving their right to bring a civil action for damages sustained. Mulder, however, addressed the issue of whether a plaintiff may seek punitive damages after receiving an award from an arbitrator premised on a determination of fault by that arbitrator. See id. at 308-10, 623 N.Y.S.2d 560.